736 So.2d 456 (1999)
Gordon T. KLEYLE, Appellant,
v.
Leon D. MITCHELL and wife Ercell Mitchell, Appellees.
No. 98-CA-00299-COA.
Court of Appeals of Mississippi.
March 23, 1999.
*457 James W. Gladden Jr., Hattiesburg, Attorney for Appellant.
Moran M. Pope III, Hattiesburg, Attorney for Appellees.
*458 BEFORE McMILLIN, C.J., KING, P.J., AND DIAZ, J.
McMILLIN, C.J., for the Court:
¶ 1. Gordon Kleyle has appealed a judgment of the Pearl River County Chancery Court. The judgment was intended to settle a dispute between Kleyle on the one hand and Leon and Ercell Mitchell on the other as to the exact location of the common boundary between two tracts of real property in rural Pearl River County. Kleyle originally raised eight issues on appeal. He attempted to add two more issues in his rebuttal brief. Finding some of the issues to be without merit while others are meritorious, we affirm in part, reverse and remand in part, and reverse and render in part.

I.

Facts
¶ 2. Kleyle and the Mitchells are the owners of two adjacent tracts of land, both of which were carved from a larger tract of some 215 acres owned by Tommy Breland and F.L. Stevens. Kleyle purchased his tract first, the sale closing in 1993. Kleyle's property was taken from the southwest portion of the Breland and Stevens acreage and consisted of 91.75 acres. The legal description for the deed was prepared by a surveyor named J.C. Bounds. Bounds also was retained to mark the boundaries on the ground by placing markers at the appropriate corners. Even before the sale closed, Kleyle proceeded to construct a fence running generally north and south, the location to be determined by the eastern boundary of his new acquisition. Kleyle testified that he intended to build the fence approximately eighteen inches west of the actual surveyed line of his eastern boundary in order to create a buffer zone between him and his neighboring property owner to the east. He wanted to do this because he intended to run cattle on his property, and he wanted to avoid any physical contact between his herd and any livestock that might be running on the land lying to the east. According to Kleyle, this buffer zone would prevent the transmission of disease from other herds into his herd.
¶ 3. Three years later, in 1996, Breland and Stevens entered into an agreement to sell a portion of their remaining acreage to the Mitchells. The Mitchell tract, to consist of 46.74 acres, was intended to lie in the southeast portion of the larger tract. It was originally contemplated that, as a result of this conveyance, Kleyle and the Mitchells would share a common border running roughly north and south, said line being Kleyle's aforementioned eastern border and the Mitchells' western border. A different surveyor, Lawrence L. Seal, was retained to conduct the survey in connection with the Mitchell transaction.
¶ 4. Seal, in performing the survey of the Mitchell tract, elected to use the southeast corner of Kleyle's tract as the point of beginning of the metes and bounds description. That point would, by definition, also be the southwest corner of the proposed Mitchell tract. In making the necessary preliminary calls to reach that point of beginning, Seal's description ran to a point that was Kleyle's southwest corner and the next call was to run along Kleyle's south boundary to his southeast corner the intended beginning point of Mitchell's description. In Kleyle's 1993 deed, the call for the distance between these two corners defining Kleyle's south boundary was 1,608 feet. However, when Seal made the actual measurement on the ground from Kleyle's southwest corner to the fence corner at his southeast corner, he discovered that the distance was, in actuality, approximately 1,613 feet, indicating that Kleyle's fence, rather than being eighteen inches inside his line as Kleyle had intended, was actually encroaching eastward onto the Breland and Stevens property. Nevertheless, Seal proceeded to prepare a legal description for the transfer to the Mitchells that called for their western boundary to run along Kleyle's fence rather than along the line as designated in *459 his deed. The effect of this was to create a very narrow strip, called a "strip" or "gore" at the common law, that ran in a north-south direction between Kleyle's eastern boundary (as defined by his deed and not as defined by his fence) and the Mitchells' western boundary.
¶ 5. Despite evidence to the contrary as shown in Seal's survey, Kleyle persisted in asserting that his fence was on his property and that, in fact, he owned a strip eighteen inches wide on the eastern side of the fence. When it became apparent that he and the Mitchells would be unable to amicably settle the location of the disputed boundary line, the Mitchells went back to Breland and Stevens and procured a separate deed conveying the disputed strip to them. The Mitchells then commenced this action asking the chancellor to adjudicate the proper boundary between their tract and the Kleyle tract.
¶ 6. Kleyle represented himself at trial. He did not have any testimony from a surveyor or other qualified expert demonstrating that the fence on his eastern boundary was, in fact, placed eighteen inches west of his eastern line as he claimed. Rather, he simply continued to assert that his fence was located exactly where he had intended it to be. The Mitchells, for their part, called Seal as a witness. He testified generally to the facts set out above, indicating the basis for his opinion as to how the narrow strip between the two properties came to be. One of the necessary logical conclusions of his testimony was that, because Kleyle's fence had encroached onto the Breland and Stevens property when it was constructed, that fence was on the Mitchells' property after they acquired title to the previously-existing strip by virtue of their second conveyance from Breland and Stevens.
¶ 7. The chancellor, after hearing all the evidence, was apparently satisfied that the strip testified about by Seal did exist, even though he couched his findings in terms of a conflict between Seal's survey and Kleyle's earlier survey done by Bounds. The chancellor, rather than attempting to resolve the factual dispute as to whether Kleyle's assertion that the true line ran eighteen inches east of his fence was correct or whether Seal's testimony that the true line ran some few feet west of Kleyle's fence was correct, elected to "solve this dilemma by equally dividing the Holiday Strip in a Northerly and Southerly direction thereby creating a new boundary line between the two tracts." In addition to creating this new boundary line, the chancellor ordered a transfer of ownership of Kleyle's fence to the Mitchells and, in what was apparently a form of permanent injunction, required Kleyle not to construct any new fence within eighteen inches of the newly-established boundary line.

II.

The Standard of Review
¶ 8. It is helpful in our deliberation to first observe the proper standard of review to assess the propriety of the chancellor's rulings. In boundary disputes, a determination of the legal boundary between properties is a question of fact for the chancellor. Farris v. Thomas, 481 So.2d 318, 318 (Miss.1985). The same standard applies to questions involving the accuracy of a survey. Hicks v. Bolton, 223 So.2d 522, 522 (Miss.1969). The chancellor's decision in this regard will not be disturbed on appeal unless we find that the chancellor committed manifest error. Id.;Wilson v. King, 226 Miss. 162, 165, 83 So.2d 767, 768 (1955).

III.

The First Issue:

Whether the chancellor erred in finding Kleyle's deed was ambiguous, unclear and insufficiently described Kleyle's property?
¶ 9. We consider this issue to be without merit for the reason that there is no reflection in the record that the chancellor ever *460 made such a finding. The real issue before the chancellor was not an alleged error in the preparation of Kleyle's deed. Rather, the question was whether Kleyle had properly located his eastern boundary line on the ground in advance of constructing his fence or whether he had, in fact, built his fence farther to the east than the legal description of his deed called for.

IV.

The Second Issue:

Did the chancellor err in finding that a gap existed between Kleyle and Mitchell's property?
¶ 10. Kleyle, after entry of the chancellor's judgment, obtained the services of another surveyor and attempted to obtain a new trial based on information developed by that surveyor. The chancellor refused to grant the new trial motion. Despite that fact, much of Kleyle's argument on this point revolves around information contained in that post-judgment survey. Kleyle has not raised the issue of the trial court's refusal to grant him a new trial based on his new survey. Therefore, it is inappropriate for this Court to consider any argument based on facts alleged to be revealed by this belated survey. We must, therefore, consider the merits of this argument based solely on evidence appearing in the record at trial.
¶ 11. Relying strictly on the calls in the two deeds, it is evident that a strip was created between the two tracts since, in Kleyle's deed, the distance from his southwest corner to his southeast corner is stated to be 1,608 feet, whereas in the Mitchells' deed, the distance from their southwest corner (which, in the absence of a strip or a gore, would be the same as Kleyle's southeast corner) to Kleyle's southwest corner is said to be 1,613.61 feet.
¶ 12. Although the court-appointed surveyor found that the gap is something less than the 5.61 feet that would be indicated by the deed calls, it seems beyond dispute that the two deeds could not possibly be read in a manner that would result in Kleyle's southeast corner and the Mitchells' southwest corner being the same point. That being the case, we are unable to say that the chancellor was manifestly in error in concluding that there was a narrow strip between the two parcels (which he referred to as a "Holiday Strip") that belonged to neither of the parties prior to the Mitchells obtaining a second deed from Breland and Stevens conveying the strip to them.

V.

The Third Issue:

Having determined that a gap between the properties was created, did the chancellor err in dividing equally between the parties?
¶ 13. To the extent that the chancellor abused his discretion in dividing this strip between the rival parties in half, even though the Mitchells had an apparentlyvalid deed to it, we are satisfied that the parties injured by that decision were the Mitchells and not Kleyle. The proper location of a disputed boundary is a controversy that has long been within the province of the chancery courts of this state to resolve. Middleton v. Howell, 127 Miss. 880, 892-93, 90 So. 725, 727 (1922). Though the decision may prove extremely difficult, it is nevertheless one the chancellor must undertake when called upon to do so, and he must adjudicate the location as best he can based on where a preponderance of the evidence indicates it to be even though the proof may be sparse and largely unsatisfactory. We do not believe that a chancellor has fulfilled this difficult duty when he concedes that the task is simply too great and proceeds to arbitrarily divide the area in dispute. Generally, a court is "without power to divest one of title to his property and vest the same in another by judicial fiat...." Mahaffey v. *461 First Nat'l Bank, 231 Miss. 798, 815, 97 So.2d 756, 762 (1957).
¶ 14. It would appear to this Court that, by a preponderance of the evidence, the disputed strip rightfully belonged to the Mitchells. The chancellor seemed to concede as much in his findings when he stated that he was dividing the strip "despite Plaintiff's [the Mitchells'] purchase thereof." However, we note that the Mitchells did not file a cross appeal attacking the chancellor's decision to divide the strip. We take that as an indication that the Mitchells are willing to concede some part of the disputed strip as the price for bringing this litigation to an end. Since, on the face of the record, it appears that Kleyle has actually benefitted from any error in the chancellor's decision to divide the disputed strip, we do not find it appropriate to reverse the chancellor's decision on this issue.

VI.

The Fourth Issue:

Did the Chancery Court err in transferring ownership of a portion of Kleyle's fence to the Mitchells?
¶ 15. In resolving the conflict between the parties by dividing the disputed property, the chancellor also ordered a change in ownership of a section of the fence built by Kleyle despite Kleyle's testimony that, if so ordered by the chancellor, he would relocate his fence. We find that the chancellor committed manifest error in granting to the Mitchells a portion of Kleyle's fence. With the possible exception of making a division of marital assets in a divorce, we are of the opinion that a chancellor, despite wide equitable power, is without authority to arbitrarily divest one person of his rightful property simply because it might wrongfully be located on the real property of another. Id. We conclude that the proper remedy for an encroachment such as this fence is to permit the encroaching owner the right to remove the encroachment under such terms as are equitable (including the restoration of the encroached-upon property to its original condition). See Turner v. Morris, 196 Miss. 297, 302, 17 So.2d 205, 207 (1944) ("The general rule is that landowner is entitled to an injunction directing the removal of a trespassing structure on his land erected thereon by the owner of adjoining land.").

VII.

The Fifth Issue:

Whether the chancellor erred in ordering that Kleyle could not build a fence within eighteen inches of the adjudicated boundary line?
¶ 16. Kleyle argues that the chancellor was without authority to prohibit him from constructing additional fences within eighteen inches of the new boundary line. Regarding such matters, the Mississippi Supreme Court has said:
In legal as well as surveying theory, a boundary enjoys exactness and may be so fixed. When theory translates into fact, [the] right becomes entitlement to exclude, which is as great on the periphery as at the core. Each landowner is entitled to exclude all others from the square inch most near the edge, as from the home place or fertile fields near the center.
Clanton v. Hathorn, 600 So.2d 963, 965 (Miss.1992). The chancellor manifestly erred in prohibiting the parties from using eighteen inches of their property. Subject to nuisance and other property laws, every owner has the right to use his land in any manner he may desire.

VIII.

The Sixth Issue:

Did the chancellor err in finding that Kleyle's fence was the boundary line between the two parcels?
¶ 17. As in the first issue raised by Kleyle, the chancellor made no such finding. This issue is without merit.

*462 IX.

The Seventh Issue:

Did the chancellor err in adopting the court-appointed surveyor's survey of the strip?
¶ 18. We have concluded that the chancellor did not err in determining the existence of the gap between the lands of the parties. Once having made that determination, the chancellor sought to fashion an equitable remedy and in doing so transferred half of the strip owned by the Mitchells to Kleyle. He did so by having a court-appointed surveyor divide the strip evenly between the parties. In devising equitable remedies, a chancery court is permitted to "so shape its decrees as to effect justice between the parties." Mississippi State Highway Comm'n v. Spencer, 233 Miss. 155, 174, 101 So.2d 499, 504 (1958). We have already concluded that the chancellor's more-or-less arbitrary decision to divide the strip equally between the litigants may have been error, but that it was not error injuring Kleyle. Having thus found that the decision to divide the strip is not one for which Kleyle may obtain relief in this appeal, we can find no error in the chancery court's use of a court-appointed surveyor to divide the disputed property. Likewise, we find no error in the acceptance of the court-appointed surveyor's equal division of the property. The use of this survey was merely the necessary mechanical means of bringing about the results decreed in the chancellor's judgment and there is no suggestion that the survey itself contained any errors prejudicial to Kleyle.

X.

The Eighth Issue:

Did the chancery court err in assessing one half of the court costs and one half of the costs of the court-appointed survey to Kleyle?
¶ 19. In his final judgment, the chancellor evenly divided court costs and the expense of the court-appointed survey. Without citing any authority on the matter, Kleyle contends that, because there was no ambiguity in his deed and because he actually owned the land lying in the strip revealed by the Seal survey, the decision to divide costs was erroneous. Because we have concluded that Kleyle's factual assertions are in error, they cannot be seen as supporting his argument against dividing costs. The chancellor is entrusted with broad discretion in apportioning court costs. Fant v. Standard Oil Co., 247 So.2d 132, 133 (Miss.1971). We can discover no abuse of that discretion in this ruling.

XI.

The Ninth and Tenth Issues:

Whether Kleyle's fence is the western boundary of Mitchells' property?

Whether a gap exists between Kleyle and Mitchell's property?
¶ 20. These two issues were raised by Kleyle for the first time in his reply brief. An appellant may not raise new issues in his reply brief. Overstreet v. Allstate Ins. Co., 474 So.2d 572, 576 (Miss. 1985) (holding that it is improper to raise additional issues or assignments of error for the first time in the reply brief of appellant, and that an appellate court is under no obligation to consider them). Additionally, we believe the issues are repetitive of those assigned in slightly different language in Kleyle's initial brief and, thus, they have already been addressed by this Court on the merits.
¶ 21. THE JUDGMENT OF THE CHANCERY COURT OF PEARL RIVER COUNTY DIVIDING THE STRIP OF PROPERTY SITUATED BETWEEN THE PARCELS OWNED BY THE APPELLANT AND THE APPELLEES IS AFFIRMED; THE JUDGMENT TRANSFERRING OWNERSHIP OF APPELLANT'S FENCE TO THE APPELLEES IS REVERSED AND REMANDED FOR THE COURT TO SET *463 SUCH TERMS AS ARE REASONABLE TO PERMIT APPELLANT TO REMOVE THE FENCE AND RESTORE THE PROPERTY TO ITS EARLIER CONDITION; AND THE JUDGMENT REQUIRING APPELLANT TO CONSTRUCT NO FENCE CLOSER THAN EIGHTEEN INCHES TO HIS EASTERN BOUNDARY LINE IS REVERSED AND RENDERED. COSTS OF THIS APPEAL ARE TO BE DIVIDED ONE HALF TO KLEYLE AND ONE HALF TO THE MITCHELLS.
KING AND SOUTHWICK, P.JJ., COLEMAN, DIAZ, PAYNE, AND THOMAS, JJ., CONCUR.
BRIDGES, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY IRVING AND LEE, JJ.
BRIDGES, J., dissenting:
¶ 22. While I agree with portions of the majority in this case, I respectfully dissent as to the majority's resolution of the following issue as stated by the majority:

Having determined that a gap between the properties was created, did the chancellor err in dividing equally between the parties?
¶ 23. In my opinion, the majority correctly concludes that the disputed strip of property belonged to the Mitchells. Ultimately the majority concludes that the Mitchells' failure to cross-appeal or complain about the chancellor's decision to divide the strip make this issue one that does not require reversal even if the chancellor's decision to evenly divide the strip was erroneous. The majority did note, and I agree, that a chancellor's equal division of disputed land is not the appropriate way to resolve a land dispute. I do not agree, however, with the majority that because the Mitchells failed to cross-appeal on this issue, we are compelled to affirm the chancellor's error.
¶ 24. The plain error doctrine allows an appellate court to address any matter which affects a substantial right of any party. State Highway Commission of Mississippi v. Hyman, 592 So.2d 952, 957 (Miss.1991). Improperly divesting one of title to property legally owned affects a substantial right Mahaffey v. First Nat'l Bank, 231 Miss. 798, 815, 97 So.2d 756, 762 (1957). Despite the Mitchells' failure to argue that the chancellor erred in divesting them of their property, I would find that this matter is within our province to address.
¶ 25. While chancellor's have broad discretion in handling property disputes, such discretion in any case is not without its limits. Denson v. George, 642 So.2d 909, 913 (Miss.1994); Brooks v. Brooks, 652 So.2d 1113, 1117 (Miss.1995). As recognized by the majority, any court is "without power to divest one of title to his property and vest the same in another by judicial fiat ..." Mahaffey v. First Nat'l Bank, 231 Miss. 798, 815, 97 So.2d 756, 762 (1957). The chancellor in this case was without authority to confiscate the Mitchells' property and divide to resolve the property dispute. Rather, his responsibility was to listen to the testimony, consider the evidence, and decide where the boundary line was located between Kleyle's and the Mitchells' property. Because the chancellor found that the strip did exist, inherently this indicates that the chancellor accepted the testimony of the Mitchells' surveyor and rejected the evidence and testimony offered on the issue by Kleyle. The majority agrees with this point as it stated that there was sufficient evidence presented to show that disputed strip of property rightfully belonged to the Mitchells. The chancellor instead applied Solomonic law, which our Supreme Court has not yet approved. Accordingly, I would conclude that the chancellor erred in dividing the strip and granting any part of the property legally owned by the Mitchells to Kleyle. Thus, I would reverse and render on this issue restoring to the Mitchells clear title to all the property that constituted the gap or "holiday strip" as defined in their land description in their deed. *464 There need be no further survey nor hearing on this matter in connection with the description of their strip of land.
¶ 26. To find otherwise, this Court would not only be making "bad law" for trial judges to follow in the future, but would cause title examiners, lending institutions, and title insurance companies consternation over such judgments and would rightly cause them to be disturbed over such decisions.
IRVING AND LEE, JJ., JOIN THIS SEPARATE WRITTEN OPINION.