856 So.2d 474 (2003)
CITY OF WAYNESBORO, Mississippi, Appellant,
v.
Robert M. McMICHAEL and Pauline McMichael, Appellees.
No. 2001-CA-01426-COA.
Court of Appeals of Mississippi.
April 8, 2003.
Rehearing Denied August 12, 2003.
Certiorari Denied December 11, 2003.
*476 John Ray Gunn, Waynesboro, attorney for appellant.
Terry L. Caves, Laurel, attorney for appellee.
En Banc.
LEE, J., for the court.

PROCEDURAL HISTORY AND FACTS
¶ 1. In February 1996, Steve Morris and the City of Waynesboro ("City") filed a joint application for a temporary restraining order and preliminary injunction, wherein the City sought to remove a fence, which appellees Robert and Pauline McMichael had erected, from across Katherine Street. Morris, who purchased the property in 1994, used the road to access his otherwise landlocked residence, and the McMichaels claimed a portion of the road was their private property. A Wayne County chancellor granted the application for temporary restraining order, and the parties signed an agreed order granting preliminary injunction, agreeing that the street would remain open until the matter of the injunction and issue of ownership of the property was tried on the merits.
¶ 2. In an amended application for preliminary injunction and complaint, the City asked the chancellor to issue a preliminary injunction concerning the following: (1) prohibiting the McMichaels from impeding, blocking, or interfering with the City's ownership and use of Katherine Street; (2) cancellation of clouds on title to all lands depicted as Katherine Street on the plat of Hudson Park Subdivision; (3) an adjudication that the City had legal title to the lands known as Katherine Street by virtue of statutory dedication by grant and/or common law dedication based on adverse possession and usage; (4) confirmation of title to Katherine Street in the City pursuant to § 11-17-29; and (5) as alternative relief, an adjudication that Morris was entitled to an easement over and across Katherine Street under the doctrine of equitable estoppel. In response, the McMichaels denied the allegations in the City's complaint and filed a counterclaim asserting ownership of the portion of Katherine Street lying west of the fence erected by the McMichaels. In their counterclaim, the McMichaels requested the court to set the land line and to quiet and confirm title or, in the alternative, to confirm title due to abandonment and non-use by the City.
¶ 3. After a trial on the merits in October 2000, the chancellor established the boundary line and found that Morris would be landlocked per the boundary; thus, the chancellor treated the case as an inverse condemnation situation finding the City had "taken" a portion of the McMichaels's property. The chancellor further awarded attorney's fees, survey costs, expert witness fees and appraisal fees to the McMichaels.[1] Thereafter, the City filed a motion to alter and amend final judgment or, in the alternative, motion for reconsideration, which was denied. The McMichaels filed a motion to alter or amend final judgment, *477 which the chancellor granted. In so doing, the chancellor vacated his prior judgment in which he had awarded $500 damages to the McMichaels and had found the City had inversely condemned the property, and he confirmed title to the land in the McMichaels.
¶ 4. On appeal, the City contests the chancellor's finding that the City did not hold fee simple title to Katherine Street, and that the chancellor erred in awarding damages in the absence of any specific request for such fees and in contradiction of established statutes and caselaw. We review these issues and find no error in the chancellor's decision; thus, we affirm.

DISCUSSION OF THE ISSUES

I. DID THE CHANCELLOR ERR IN RULING THAT THE CITY DID NOT HOLD FEE SIMPLE TITLE TO KATHERINE STREET?
¶ 5. In its first argument, the City argues the chancellor was clearly erroneous in adjudicating the boundary line, resulting in the McMichaels's owning fee simple title to a portion of the disputed roadway known as Katherine Street. We look to our standard of review:
In boundary disputes, a determination of the legal boundary between properties is a question of fact for the chancellor. The same standard applies to questions involving the accuracy of a survey. The chancellor's decision in this regard will not be disturbed on appeal unless we find that the chancellor committed manifest error.
Kleyle v. Mitchell, 736 So.2d 456(¶ 8) (Miss.Ct.App.1999) (citations omitted).
¶ 6. The City claims the chancellor misinterpreted the testimony and evidence in setting the boundary line, and in failing to recognize an old fence line as the proper boundary. Several surveys were conducted on the McMichaels's property, all reaching different conclusions as to the proper boundary line. The City chooses to rely most heavily on the testimony of Spencer Hudson, the son of H.S. and Katherine Hudson who dedicated the land to the City in 1959. Spencer Hudson was a practicing but not licensed surveyor when the plat was dedicated to the City, and he used an old wire fence as the dividing line between the Hudson property and the McMichael property. The City also refers us to adjoining landowner Gene Barnett's testimony. Barnett testified that when he purchased his property in 1962, a fence line on the east side of his property lined up with the north/south fence line bordering Katherine Street, and he recognized the fence as the boundary line. The McMichaels rely on the testimony of surveyor James Saul who established the section line between sections one and two, as described on his plat, and concluded that the McMichaels's property was east of the section line.
¶ 7. The 1959 dedication included a metes and bounds description, which did not encompass the area west of the iron pipe the chancellor used to mark the boundary, and which also made no reference to the fence line the City alleges is the true boundary. The McMichaels argue that the plain language of the subdivision plat clearly shows where the boundary line is to be, without reference to any fence, and they cite to Biloxi Dev. Comm'n v. Frey, 401 So.2d 716 (Miss.1981), which states "[a] call for natural or artificial monuments will prevail over courses and distances in discrepancies in deeds...." Id. at 720. Here, no natural or artificial monuments, including the fence, are referenced in the deed; thus, the City's argument that the fence is the proper boundary does not prevail over the specific metes *478 and bounds language set forth in the deed itself.
¶ 8. The City also alternatively argues that they acquired title to Katherine Street via adverse possession. To prove entitlement to land via adverse possession, "the property must be (1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful.... The burden of proof is on the adverse possessor to show by clear and convincing evidence that each element is met." Ellison v. Meek, 820 So.2d 730(¶ 13) (Miss.Ct. App.2002).
¶ 9. During the trial, the City made a very feeble argument that it was entitled to the strip of land via adverse possession. The City claims that Spencer Hudson's and Gene Barnett's testimony are sufficient to support a finding of ownership by adverse possession, and the City cites Roebuck v. Massey, 741 So.2d 375 (Miss.Ct. App.1999), as authority.
¶ 10. In Roebuck, the evidence showed that the fence in question had existed since 1928, timber was cut on the land in the 1940s, cattle grazed on it in the 1950s, and the would-be adverse possessors exclusively used the land from 1928 through 1974. Id. at (¶ 42). Additionally, the chancellor reviewed the testimony of four different neighbors, all of whom testified that an old fence had been recognized as the boundary between adjoining property. Id. at (¶¶ 42-44). The chancellor recognized the rule that the existence of an old fence, including disputed land in with the land of the claimant, has previously been held to constitute strong evidence of the elements required to prove adverse possession,[2] and he concluded that substantial evidence existed to show the appellees acquired the land through adverse possession, which this Court affirmed. Id.
¶ 11. The present case is distinguishable from Roebuck. In contrast to the numerous neighbors who testified in Roebuck and vast evidence of activity through the years, in the present case only one neighbor testified, and the evidence from all of the surveys was conflicting. Plus, the only evidence the City presented concerning activity on the property was that the City bushhogged the area once or twice during a thirty-five year period. The City made no improvements to the road nor erected any signs or repaired the fence, and any use by the City was sporadic at best, failing to meet the "continuous" or "exclusive" element of the adverse possession test. The chancellor was not provided clear and convincing evidence concerning the use of or activity on the land in question as would pass title through adverse possession. Thus, we find no merit to the adverse possession argument.
¶ 12. This decision concerned a preliminary injunction and fees and damages related thereto; thus, the chancellor did not order relief concerning Morris's dilemma of accessing his property. With our decision to affirm the chancellor, however, Morris is left with at least three alternatives concerning access to his property: he can seek an easement from the McMichaels to use the portion of the road which includes their property, he can purchase the McMichaels's land which makes up part of the road, or, since the City assured Morris at the time he bought his lot that the access road was City property, he could urge the City to "take" the property by eminent domain since Morris is landlocked. *479 Regardless of how Morris proceeds from this point, we find no clear error in the chancellor's decision concerning the boundary line, and we affirm.

II. DID THE CHANCELLOR ERR IN AWARDING ATTORNEY'S FEES AND DAMAGES TO THE MCMICHAELS?
¶ 13. The City argues that since the preliminary injunction was an agreed order approved by the parties, the award of damages was improper, since the injunction was merely incidental to the greater dispute of the boundary line.
If the relief sought is for an injunction alone, attorneys fees for dissolution must be allowed. However, where the prayer for injunction is ancillary to the main relief sought and the entire case is heard finally, and not separately on any preliminary motion to dissolve, attorneys fees should not be allowed.... But, where the entire relief sought is controlled by the injunction, attorneys fees are allowable, even though there is no preliminary motion to dissolve the injunction and the injunction is not dissolved until the final hearing on the merits.
Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1270-71 (Miss.1987) (citations omitted). As we addressed in the first issue, although it may appear to be the case, ownership of the land was not the issue in this case. The deed was clear and specific with regard to the metes and bounds description, and the City raised what amounted to be a meritless argument of adverse possession. Rather, the issue in this case is the City's acquiring the injunction to prevent the McMichaels from using what was clearly and unambiguously their own land, and the City's intimidating the McMichaels to cover for the erroneous opinion it rendered to Morris concerning the City's supposed ownership of the street. In light of Rice Researchers, we find attorney's fees were altogether reasonably awarded to the McMichaels.
¶ 14. The City also argues that the McMichaels were required to submit a written request for damages. The City refers to the following authority in support of this claim:
Where the party claiming damages shall desire, upon the dissolution of an injunction, to have the same ascertained and decreed by the chancellor or the chancery court, he shall suggest in writing, on the hearing of the motion to dissolve the injunction, the nature and amount of the damages; and the chancellor or court shall hear evidence, if necessary, and assess the damages....
Miss.Code Ann. § 11-13-37 (Supp.2002). In the McMichaels's counterclaim, they did request attorney's fees specifically, the same as they did in their motion to dismiss and several other motions. As the chancellor noted, the City initiated this action to have the McMichaels remove the fence from their own property, and the McMichaels were forced to hire attorneys, hire surveyors and incur expenses, while doing nothing to violate the City's rights; thus, the chancellor found the City was responsible for the expenses the McMichaels incurred, and we affirm. As the McMichaels point out, the injunction remained in force for six and a half years, during which time they were forced to allow their land to be used or "taken" by the City to benefit Morris. Rule 65(c) of the Mississippi Rules of Civil Procedure states in part:
No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs, damages, and reasonable attorney's fees as may be incurred or suffered by any party who *480 is found to have been wrongfully enjoined or restrained....

M.R.C.P. 65(c) (emphasis added). We find that in light of the City's actions in essentially restraining or "taking" the McMichaels's property without due compensation, the chancellor was well within his authority to award attorney's fees as damages to the McMichaels. Thus, we affirm on this issue.
¶ 15. THE JUDGMENT OF THE WAYNE COUNTY CHANCERY COURT IS AFFIRMED. STATUTORY PENALTIES AND INTEREST ARE ASSESSED AGAINST THE APPELLANT. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
BRIDGES, THOMAS, MYERS AND GRIFFIS, JJ., CONCUR. SOUTHWICK, P.J., DISSENTS WITH A SEPARATE WRITTEN OPINION JOINED BY MCMILLIN, C.J., KING, P.J., IRVING AND CHANDLER, JJ.
SOUTHWICK, P.J., dissenting:
¶ 16. This case involves the effect of a 1959 subdivision dedication when the western boundary description may have been erroneous. The chancellor and the majority on appeal rely on evidence that the section line, which in the legal description marks the western boundary of the subdivision, has after a recent survey been found to lie about fifteen feet east of where it had long been thought to be. Another survey discussed in the record placed the section line still farther east. Since the City cannot show adverse possession since the dedication in 1959, the decision that is here affirmed alters the subdivision. Now the boundary is in the middle of a subdivision street since that was shown by a present-day survey to be the actual location of the section line.
¶ 17. With respect, I find that the chancellor made findings on the wrong legal question. We should not be trying to determine who has possessed this westernmost property in the subdivision since 1959. Instead, we should determine whether there is persuasive evidence that a particular fence line had long been considered before the subdivision was dedicated to be the dividing line between the owners of adjacent tracts. If that fence was recognized as the boundary, then once it is discovered that the fence is not actually on the section line, then it is the legal description that must be altered on paper, not the actual boundary on the ground. Thus, I respectfully dissent.
¶ 18. The central question in this case is the effect of a dedication of property when an improper description is used. There was evidence that the subdivision plat, when corrected for the mistake about the location of the section line, is properly laid out on the ground. In other words, correcting for what may be an historical misunderstanding of the location of the section line, the subdivision is correctly laid out but the lots and streets are shifted on the ground fifteen feet west from where the legal descriptions would have them be. Though our case focuses on one street and one owner, the question affects the whole subdivision. Perhaps the dedication is of what the subdivider thought was the physical property that he was dedicating. That would require adjusting the legal description of the whole subdivision by shifting in the direction that corrects for what the subdivider actually owned. This ownership would include what the subdivider owned as a result of prior adverse possession to the actual, though wrongly described, boundary; such a description correction might also excise an equivalent area on the opposite side of the subdivision, but that factual matter is not before us. Alternatively, the dedication might be *481 only of the property found on the ground by a careful survey using the legal description of the subdivision. Any omissions would have to be supplied by adverse possession after the date of dedication.
¶ 19. I examine each of the following issues in reaching my conclusions about this appeal:
1. Did the subdivider Hudson hold record title up to the boundary of an old fence in 1959?
2. If not, had Hudson acquired title up to the old fence through adverse possession by 1959?
3. What property did the City acquire upon Hudson's dedication of this subdivision?
4. Has the City acquired title up to the old fence through adverse possession to date?

1. Did Hudson hold record title to all property east of the old fence in 1959?
¶ 20. A present-day survey indicates that the true location of the section line is not at an old fence, but instead is about fifteen feet east of the fence. I do not question the validity of the survey nor that the legal descriptions in old deeds and on the subdivision plat itself used the section line as the boundary. Another survey acquired by the McMichaels referenced in the record would have placed the section line still farther east, such that the entire width of the platted street was on their land. Yet no one has argued that this case is solely about resolving the vagaries of surveys using legal descriptions and then declaring current ownership. Land does not bend to such easy rules.
¶ 21. As to the first step, then, I agree that there was usable evidence from one survey accepted by the chancellor that the section line as located, and the subdivision as laid out, left part of the street in question west of the section line. But this is only the first step.

2. Did Hudson acquire title prior to 1959 by adverse possession?
¶ 22. I find no meaningful dispute in the record that Hudson and his predecessors thought they owned west to the section line, and that farther west was the property owned by the McMichaels and their predecessors. The City offered three significant pieces of evidence to suggest that an old fence was thought to be on that section line and therefore to mark the property boundary:
1. Spencer Hudson, son of the grantor and surveyor of the Hudson Park plat, testified that his family claimed all lands east of a fence that had been in existence since before Hudson Lane was created in 1943. He was convinced the old fence was the section line. Even if he was in error on where a proper survey would place the section line, his testimony on where owners thought it was is not undermined by that.
2. The Hudsons granted Mississippi Power Company a fifty foot utility easement in 1959, the centerline being twenty-five feet east of the corner of their property, running north parallel to the section line. The multiple surveys performed all substantially agree that a power pole in that location is approximately twenty-five feet from the old fence. That suggests that the fence was the erroneously recognized section line in 1959.
3. Gene Barnett is a resident south of Hudson Lane, which is the southern boundary of Hudson Park subdivision, and west of the disputed boundary. He bought his land in 1962. Barnett testified that the old fence line has been recognized as the property dividing line.
*482 ¶ 23. I find no contrary evidence regarding the recognized boundary prior to 1959. The recent surveys have established the section line on the ground as being east of the old fence and either in the middle of the platted road or even crossing the western edge of the subdivision lots.
¶ 24. There was some evidence that the owners to the west, the McMichaels, have claimed the land up to an iron pipe that has been placed east of the old fence. Some witnesses who lived in the community were aware of the McMichael claim. But I find no evidence that the claim arose until after the subdivision was dedicated. What slight evidence there was on the date that the claim started was that McMichael's grandfather believed the iron pipe was set by a surveyor whose work was performed in 1966, seven years after the Hudson Park subdivision plat was submitted.
¶ 25. Thus I find that the only evidence in the record is that the old fence was thought in 1959 to be the section line. The effect on the subdivision dedication when there is an error about the location of a property boundary will be discussed below. Prior to considering that issue, though, it should be understood that if in 1959 the property owners were in agreement that the fence line was their boundary, then it becomes the actual legal boundary if the owners had acquiesced in that location for the ten year period of adverse possession. Coastal States Ltd. v. City of Gulfport, 480 So.2d 1113, 1114 (Miss.1985). There is strong evidence that, prior to 1959, such acquiescence occurred. A discovery much later that the actual section line was elsewhere does not alter prior title.
¶ 26. Acquiescence is a form of adverse possession, which requires possession to be "(1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful." Thornhill v. Caroline Hunt Trust Estate, 594 So.2d 1150, 1152-53 (Miss.1992). Other than the strong possibility that the boundary was recognized as being the fence, there was not much useful evidence on use. Hudson testified that the land was used for agricultural purposes, such as for a pea patch and for cattle grazing. McMichael also testified that he had never seen the Hudsons graze cattle on the property and that it was largely covered in brush and grass.
¶ 27. As to possession or acquiescence, I find substantial evidence that prior to 1959, the old fence was thought to be the boundary. Therefore, there was evidence on which the chancellor could rely that in 1959, the fence was the western boundary of the Hudson property. However, no findings by the chancellor as to that time period were made. Whether that is the proper time to be considering acquiescence is answered by the next issue.

3. What property was dedicated to the City in 1959?
¶ 28. This case is resolved by determining what property was dedicated to the City. Is it only the property that fits within the legal description as determined by a survey almost forty years later, or is it the property that the subdivider and adjacent landowners agreed was owned and which they would have thought was being dedicated, even if that understanding including an error about the location of a section line used as a boundary?
¶ 29. The dedication that occurred here was controlled by an earlier codification of this statute:
The governing authorities of municipalities may provide that any person desiring to subdivide a tract of land within the corporate limits, shall submit a map and plat of such subdivision, and a correct abstract of title of the land *483 platted, to said governing authorities, to be approved by them before the same shall be filed for record in the land records of the county. Where the municipality has adopted an ordinance so providing, no such map or plat of any such subdivision shall be recorded by the chancery clerk unless same has been approved by said governing authorities. In all cases where a map or plat of the subdivision is submitted to the governing authorities of a municipality, and is by them approved, all streets, roads, alleys and other public ways set forth and shown on said map or plat shall be thereby dedicated to the public use, and shall not be used otherwise unless and until said map or plat is vacated in the manner provided by law, notwithstanding that said streets, roads, alleys or other public ways have not been actually opened for the use of the public.

Miss.Code Ann. § 21-19-63 (Rev.2001) (emphasis added).
¶ 30. Certainly the dedication did not extend to lands not owned by the grantor. If streets were laid out and houses built on lots that the subdivider did not own, only adverse possession after such actions were taken could oust the prior owner. We are looking at a potentially different set of facts, namely, that due to prior possession and acquiescence, the subdivider may have owned the land between the fence and the section line as now surveyed. If Hudson did own that land west of the now-surveyed section line and east of the then-existing fence, and if the City received by the dedication the right to place a street on the land, the City's rights were impervious to erosion through abandonment or disuse. Nettleton Church of Christ v. Conwill, 707 So.2d 1075, 1077 (Miss.1997). Thus, whatever property the City got in 1959 when it accepted the dedication remains the property that it may use for a street today.
¶ 31. Our case concerns a street that was not constructed until almost forty years after the dedication. What I find puts the legal issue in better focus is to examine the hypothetical situation of a description error discovered much sooner. If there was error in the description, it should not matter when the error is discovered insofar as deciding what actual land was dedicated.
¶ 32. The City could have constructed this street almost immediately after the 1959 dedication. Assuming no survey was done then and instead the street was built with the fence line considered to be the western boundary of the subdivision, the street would have straddled what the survey introduced in the present case indicated was the section line. If the street had remained in place with no dispute for over ten years, then possession would have removed the issue that we face. However, what would have occurred if five years after street construction a survey discovered the description error? Would the City have been a trespasser on the part of the street that extended west into the next section but was still within the land that Hudson and his neighbors thought was east of the section line? If it was shown that Hudson had, prior to filing the subdivision plat, owned the property up to the fence line because of prior possession, then the real choice in the litigation would have been whether Hudson or the City owned the property. Upon accepting proof of Hudson's prior possession, a court would have determined that McMichael was not a contender for title.
¶ 33. As between the City and Hudson, probably principles of estoppel would have come into play. Yet putting that aside, I find that this would be the same situation that arises with some frequency between private landowners. If the evidence is accepted *484 that in 1959 the landowners acquiesced to the fence line as being their boundary, making all legal descriptions that referred to the section line as intending to refer to the fence line, then any deed in which the parties were operating under that misapprehension would have been based on a mutual mistake. When the correct description of a tract's boundary is misunderstood, a court of equity should reform the instrument and make it conform to the real agreement of the parties. Veterans Administration v. Bullock, 254 Miss. 562, 570, 180 So.2d 610, 614 (1965).
¶ 34. The legal description used to dedicate a subdivision should be subject to the same rules of reformation. The City would not be a traditional grantee. Yet when a city approves a subdivision, its acquisition of the "public ways" on the filed plat is sufficiently similar to the actions of a grantee that I would apply the principle. The City has argued that what Hudson and the community understood to be the boundary was the fence. Post-1959 actions by the City and private owners in the subdivision, including the City's construction of other streets and the building of houses, must at times have relied on the mistaken belief of the location of the westernmost boundary.
¶ 35. In its application for a preliminary injunction to have the McMichaels stop interfering with the building of the street, the City argued that either the planned street lay entirely east of the section line, or else the City and its predecessors in title had acquired title by adverse possession. In its appeal brief, the City argued that the location of the section line is not the issue for determination, but "the location of the property division line on the ground by the parties and their predecessors in title" is what settles the rights of the parties. Without using the words, the City has been arguing a mutual mistake and that it actually received what Hudson thought he owned. A mutual mistake of fact must be proven beyond a reasonable doubt. APAC-Mississippi, Inc. v. JHN, Inc., 818 So.2d 1213, 1217 (Miss.Ct.App. 2002) (reviewing conflicting precedents on standard of proof).
¶ 36. What was dedicated was what the Hudsons actually owned in 1959, which may take a correction of description today to reflect that ownership. Thus, the City has sought to focus the court on the time prior to 1959, when the subdivision was platted. I agree with that focus.
¶ 37. In my view, a City through a dedication receives all property lying within the platted subdivision street rights-of-way, subject to the rules of reformation for correcting the description if an error should later be discovered. I think there was evidence of such mutual mistake that, if accepted by the chancellor, entitled to the City to a reformation of the description on the plat.
¶ 38. Let me also state that if Hudson owned other contiguous property as a result of adverse possession, and if the failure to describe it in a plat was not the result of a mutual mistake of fact as to the proper description, then the dedication would not include that additional property. Stallings v. Bailey, 558 So.2d 858, 861 (Miss.1990). What was dedicated here was any property that Hudson thought he was dedicating but failed to include because of a mistake as to the description.

4. Has the City acquired title to the old fence through adverse possession to date?
¶ 39. This is the issue analyzed by the majority on appeal. I find the majority's conclusion that the City's possession since 1959 would not have acquired title is convincing, but as already indicated, the issue *485 does not appear relevant. The City did not have to show possession. It only had to show that the land dedicated for the subdivision has, from the beginning, extended to the old fence line that apparently was mistakenly believed in 1959 to be the true section line.
¶ 40. Insofar as the McMichaels reacquiring title by possession since 1959, that is not possible here for two reasons. First, adverse possession against a city is barred by the state constitution. Miss. Const. art. 4, § 104 (1890). If the City got it, the City kept it. Secondly, though the chancellor did not find meaningful possession by the City so as to gain it title had that been necessary, neither was there evidence of significant use by the McMichaels. At best, there was what has at times been referred to as "scrambling possession" of an infrequent and noncontinuous manner. Stallings, 558 So.2d at 861. When one owner acquires title by adverse possession, the former owner may certainly reacquire title if all the necessary elements then exist in reverse for a new ten year period. Cole v. Burleson, 375 So.2d 1046, 1049 (Miss.1979). I do not find any evidence that the McMichaels had actual or hostile, open, notorious, and visible possession under a claim of ownership, continuously, exclusively, and peacefully, and without interruption for a period of ten years after 1959.
¶ 41. There was evidence presented that would support that the Hudsons had acquired before 1959 title to all land in this location east of the old fence. There was also evidence that the Hudsons and the community believed that the section line was both the property boundary and was marked by the fence. I would remand the case to the fact-finder to make the controlling determinations.
MCMILLIN, C.J., KING, P.J., IRVING AND CHANDLER, JJ., JOIN THIS SEPARATE WRITTEN OPINION.
NOTES
[1] Morris and the City of Waynesboro were co-plaintiffs throughout the course of the proceedings. However, as recited in the chancellor's oral opinion which was incorporated into the final judgment by reference, Morris relied upon representations made by the attorney for the City; thus, Morris was not held liable for any costs, fees or expenses, which the chancellor ordered be entirely borne by the City.
[2] See Roy v. Kayser, 501 So.2d 1110, 1112 (Miss.1987), for a listing of cases dating back to 1890 where the supreme court has found that the presence of a fence helped to demonstrate title to land by adverse possession.