MYERS, P.J.,
 

 for the Court:
 

 ¶ 1. This case comes before the Court from a judgment entered by the Chancery Court of Bolivar County granting Mabel Johnson’s (Mabel)
 
 [1]
 
 action for ejectment and directing Delta Housing Development Corporation (Delta) to remove all infrastructure that it placed on Mabel’s property. Specifically, the order mandates the removal of a fire hydrant, manhole, and a sewage-lift station, as well as water and sewer lines, and the encroaching portions of a street. Feeling aggrieved, Delta appeals to this Court and argues the following: (1) the adoption of the plat of the Rox-C-Sneed subdivision by the City of Mound Bayou in 1947 is presumptively valid; (2) the action filed by Mabel is barred by res judicata; and (8) Mabel’s action for a mandatory injunction is barred by laches and/or equitable estoppel. Finding no error, we were affirm the chancery court’s judgment.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. In 1944, Mabel’s father, Holt Johnson, purchased an eighty-acre tract of land in Mound Bayou, Mississippi.
 
 [2]
 
 In 1947, the City of Mound Bayou adopted a plat for the Rox-C-Sneed subdivision, which
 
 *576
 
 was recorded in the land records in the office of the Bolivar County Chancery Clerk; this property lies adjacent to Mabel’s east-property line. The Rox-C-Sneed subdivision plat, as the chancery court would later determine, contained an error in the description of the west-property line, which created a “pie shape” overlap onto Mabel’s property, up to eighteen-feet wide.
 

 ¶ 3. In 1988, the “unplatted portion of Block 2” in the Rox-C-Sneed subdivision was sold for taxes by the Bolivar County Tax Collector and purchased by Herman Johnson.
 
 [3]
 
 Following the redemption period, the chancery clerk executed a tax deed to Herman. In 1993, Herman executed a quit claim deed to his wife, Alfreta Johnson.
 
 [4]
 
 In 1994, Herman and Alfreta filed a petition in the chancery court to confirm title and remove clouds on the property. A judgment confirming title was entered on February 2, 1995. Alfreta shortly thereafter conveyed 6.02 acres of the property by warranty deed to Delta.
 
 [5]
 
 After receiving the warranty deed to the property, Clanton Beamon, Executive Director of Delta, submitted a preliminary plat to the Mayor and Board of Alderman of Mound Bayou for approval of a subdivision to be called the Sam Thompson Green Acres Subdivision. The plat eventually was adopted by the City of Mound Bayou in 2006.
 

 ¶4. Prior to the judgment confirming title in 1995, Delta had contracted with Hooker Engineering Services to conduct a survey of the property. According to the record, Beamon stated in his testimony that before Hooker conducted the survey, he had assumed that Mabel’s property line was demarcated by a drainage ditch. Beamon said that upon inspection of the property following the survey, he was surprised to discover a survey-stake angled out into Mabel’s field.
 

 ¶ 5. According to Mabel, she learned through Beamon sometime in early 1996 that Delta intended to develop the property adjacent to hers. Mabel told Beamon that she had no problem with the project as long as the construction did not interfere with her property.
 

 ¶ 6. In July 1996, Mabel received a letter from Delta’s legal counsel informing her that, based on the survey conducted by Hooker, Delta’s west property line extends to and across land claimed to be owned by her. The letter requested that Mabel provide Delta with any surveys or legal documents she might have reflecting otherwise.
 

 ¶7. Mabel sought legal counsel. She spoke to a number of attorneys, but for various reasons, she was unable to attain their assistance. Eventually, she hired Jeffrey Levingston. Levingston assisted Mabel for a short period in the fall of 1996 before he withdrew from the matter, due to an apparent conflict.
 

 ¶ 8. In October 1996, Delta’s contractor, Jimmy Douglas, staked the areas where the utility structures in question were to be placed. Levingston sent correspondence to Delta advising the company that it was encroaching onto Mabel’s property. Lev-ingston informed Delta that a drainage ditch delineates Mabel’s east-property line. Levingston disclosed that he was not sure
 
 *577
 
 what a survey would show in terms of record title, but he was confident Mabel at least had title by virtue of adverse possession; thus, he would not hesitate filing suit in order to preserve Mabel’s rights. Lev-ingston strongly suggested to Delta that any construction activities should be carried out east of Mabel’s boundary line. Construction continued, and at some point in October 1996, Mabel had Beamon arrested for trespassing. On the advice of Levingston, Mabel dropped the charges.
 

 ¶ 9. Sometime in the first half of 1997, after Levingston withdrew from the case, Mabel hired her present attorney, Derek Hopson. In June of that year, she contracted with Allen & Hoshall, Ltd. to conduct a survey to establish her property’s boundary lines. Meanwhile, Delta continued construction. Douglas filled in the ditch that supposedly marked Mabel’s east-property line. He installed the sewage-lift station in December 1996; he finished the water and sewer lines in June 1997; and two-months later, he completed the roadbed. According to Mabel, a pecan tree located on the strip of land in question, and which was planted there by her late son many years ago, was removed during the process.
 

 ¶ 10. On August 19, 1997, Mabel filed a petition in the chancery court against Delta, Herman, and Alfreta, which requested a temporary injunction be issued restraining Delta from carrying on development and construction operations on her real property.
 
 [6]
 
 The chancery court issued a temporary restraining order (TRO) that same day. According to the record, a proposed order was drafted by Hopson and approved by Delta’s legal counsel, which would have extended the TRO. However, the order was never signed by the chancellor. On September 9, 1997, Mabel filed an amended petition for permanent injunction, restoration of land, order confirming title, and monetary damages.
 

 ¶ 11. That same day, on September 9, Delta filed its answer to the TRO petition filed by Mabel on August 19. Delta claimed that the exact boundaries of the property described in Mabel’s petition were in dispute, and it pleaded the affirmative defenses of res judicata and laches. According to Delta, because the chancery court had entered a final decree in 1995, adjudicating its predecessor’s title to the unplatted portion of the Rox-C-Sneed-subdivision, Mabel’s action was barred under the doctrine of res judicata. Delta also claimed that Mabel was aware of the development project as early as 1994, and because she took no legal action to assert and/or secure her rights, her action was barred under the doctrine of laches. Delta filed a counterclaim against Mabel, alleging, inter alia, that as a result of the TRO, it suffered losses in excess of $50,000. Delta sought compensatory damages in the amount of $100,000. According to the record, Delta continued construction after the TRO expired.
 

 ¶ 12. On January 16, 1998, the chancery court issued an order appointing David Evans, an experienced and qualified land surveyor, as special master for the purpose of deciphering and interpreting the parties’ respective and conflicting surveys. Evans was instructed to inspect the land in question. Evans found that the Alen & Hoshall survey correctly established Mabel’s east-property line. According to Evans, the Rox-C-Sneed subdivision plat, which was filed in the office of land records for Bolivar County subsequent to the recordation of Holt’s deed, contained an incorrect course run for its west-property line. When Hooker conducted its survey,
 
 *578
 
 it drew from this erroneous description, which resulted in a zero-to-eighteen-foot overlap onto Mabel’s property.
 
 [7]
 

 ¶ 13. On February 25, 1998, the chancery court issued an order accepting the special master’s findings. Delta did not contest these findings.
 

 ¶ 14. The matter was set for trial to begin on April 17, 1998. Mabel thereafter amended her complaint to include ownership by adverse possession of another strip of land some thirty to thirty-five-feet wide which runs parallel to her east boundary line as established by the Allen & Hoshall survey. The additional strip of land was inclusive of property on which two houses had recently been constructed and for which the United States held mortgages and deeds of trust. As the United States was a defendant, the case was removed to the United States District Court for the Northern District of Mississippi. In 2005, the district court granted summary judgment in favor of the defendants which was affirmed by the Fifth Circuit Court of Appeals.
 
 [8]
 
 The United States was subsequently dismissed as a party, and the case was remanded to chancery court for trial of the remaining claims.
 

 ¶ 15. Upon trial of this cause, the chancery court entered a judgment granting Mabel’s claim for ejectment and order confirming title. The chancery court directed Delta to remove all the above-mentioned infrastructure from her property.
 

 STANDARD OF REVIEW
 

 ¶ 16. We defer to a chancery court’s findings, unless its decision “is manifestly wrong and not supported by substantial credible evidence, or unless an erroneous legal standard was applied.”
 
 Saliba v. Saliba,
 
 753 So.2d 1095, 1098 (¶ 11) (Miss.2000). On questions of law, our standard of review is de novo.
 
 Harrison County v. City of Gulfport,
 
 557 So.2d 780, 784 (Miss.1990).
 

 DISCUSSION
 

 I. Adoption of the Rox-C-Sneed Subdivision Plat
 

 ¶ 17. Delta argues that because the Rox-C-Sneed subdivision plat was adopted by the City of Mound Bayou in 1947 and duly recorded in the land records of Bolivar County, a presumption of validity exists in its favor. Relying on
 
 Taquino v. City of Ocean Springs,
 
 253 So.2d 854, 855 (Miss.1971) and
 
 Luter v. Oakhurst
 
 Assoc.,
 
 Ltd.,
 
 529 So.2d 889, 894 (Miss.1988) for authority, Delta contends that the adoption of the subdivision plat by the City of Mound Bayou is presumptively valid, and that any party seeking to attack its validity has the burden to show that the
 
 *579
 
 action was arbitrary, carpricious, discriminatory, or beyond the legal authority of the Mayor and Board of Aldermen of Mound Bayou. Delta submits that Mabel failed to adduce evidence in this matter to rebut this presumption. Therefore, the Rox-C-Sneed subdivision’s plat should be declared valid, as well as all conveyances made thereafter. Also, Delta claims that the City of Mound Bayou is a necessary party to this action pursuant Rule 19 of the Mississippi Rules of Civil Procedure.
 

 ¶ 18. Both
 
 Taquino
 
 and
 
 Luter
 
 are distinguishable from the matter before this Court.
 
 Taquino
 
 dealt with an action by the Mayor and Board of Aldermen of Ocean Springs, as to whether land owners should be required to dedicate a portion of their property to allow the widening of an existing public street adjacent to a proposed subdivision.
 
 Taquino,
 
 258 So.2d at 855. The supreme court found that, according to the official minutes of the city governing board for January 27, 1970, it was determined that the City of Ocean Springs did not require a fifty-foot right of way by the subdivision due to economical reasons and feasibility.
 
 Id.
 
 As was also reflected by the minutes, the City of Ocean Springs then approved the application of the plat for the subdivision.
 
 Id.
 
 None of the appellants appeared at the meeting; however, they objected to the action taken by the Mayor and Board of Aldermen on appeal to the circuit court, which thereafter affirmed the action taken by the City of Ocean Springs.
 
 Id.
 
 at 854. In affirming the circuit court’s judgment, the supreme court stated as follows: “The action of the City Governing Board is presumed to be valid. The appellants, in attacking that action, must show that it was arbitrary, capricious, discriminatory, or beyond the legal authority of the City Board.”
 
 Id.
 
 at 855 (citations omitted). The court held that the appellants did not meet their burden, and it found the action taken by the City of Ocean Springs in preliminarily approving the subdivision plat “was supported by substantial evidence, and was not arbitrary, capricious or discriminatory.”
 
 Id.
 

 ¶ 19.
 
 Luter
 
 involved a zoning issue. The City of Tylertown failed to have a zoning ordinance read aloud at a public meeting, and it did not have a roll call before its enactment.
 
 Luter,
 
 529 So.2d at 894. The supreme court reiterated that “[t]he official action of the governing authorities of a municipal corporation in this state are presumed valid, albeit rebuttably so.”
 
 Id.
 
 at 894 (citations omitted). The
 
 Luter
 
 court explained:
 

 What this means — and the point is critical in this case — is that those who would challenge the formal regularity of the prior act of a municipal corporation bear the burden of demonstrating affirmatively wherein the failures occurred.
 
 See City of Biloxi v. Cawley,
 
 278 So.2d 389, 390 (Miss.1973);
 
 City of Greenwood v. Jones,
 
 91 Miss. 728, 46 So. 161, 163 (1908). No doubt as a practical matter proof of a negative may be difficult, particularly where a number of years have elapsed. Yet we regard the presumption vital in that otherwise untold scores of official actions may be invalidated, not because the board or agency failed of compliance, but because the draftsman of the minutes failed to use the requisite magic words.
 
 See Paine v. Underwood,
 
 203 So.2d 593, 597 (Miss.1967).
 

 Id.
 
 The supreme court concluded that the minutes of the Mayor and the Board of Aldermen’s meeting adequately reflected their intent, and the court held that this was “enough to raise a presumption of regularity shifting to the opponents the burden of affirmative demonstration wherein the [City’s] action failed [to comply] with essential formalities.”
 
 Id.
 
 at 895.
 

 
 *580
 
 ¶ 20. In the instant ease, we are without the minutes reflecting the City of Mound Bayou’s adoption of the Rox-C-Sneed subdivision plat in 1947, as both parties agree the minutes could not be located. Thus, we have no way of knowing whether the City’s action conformed to the procedural formalities required by law.
 
 See id.
 
 at 894 (“As a man’s will is invalid and ineffective if he fails to conform to the formalities of the statute, so a municipal ordinance is invalid if it has not been enacted according to procedural prerequisites.”). However, it is unnecessary for us to express whether such omission constitutes what the
 
 Luter
 
 court meant by “proof of a negative.”
 
 See id.
 
 Whatever presumptive validity might have existed with the description of the adopted plat’s west-boundary line, Mabel successfully overcame it by proving that the description was in error.
 

 ¶ 21. “[A] determination of the legal boundary between properties is a question of fact for the chancellor.”
 
 Kleyle v. Mitchell,
 
 736 So.2d 456, 459 (¶ 8) (Miss.Ct.App.1999) (citing
 
 Farris v. Thomas,
 
 481 So.2d 318, 318 (Miss.1985)). Delta filed no objection, as set forth under Mississippi Rules of Civil Procedure 53(g)(2), to the findings of the special master appointed by the chancery court to locate the true boundary line between the two properties. Therefore, Delta waived any objections it may have had with the factual conclusions submitted by the special master and accepted by the chancery court in this matter.
 
 Cuevas v. Kellum,
 
 12 So.3d 1154, 1159 (¶ 21) (Miss.Ct.App.2009). The chancery court determined that the Rox-C-Sneed subdivision plat contained an improper course description, which Hooker relied upon in conducting its survey. The Allen & Hoshall survey, on the other hand, conclusively established Mabel’s east-property line. The court ultimately concluded that Mabel and her predecessors-in-title were the rightful owners of the strip of land in dispute.
 

 ¶ 22. This decision by the chancery court effectively means that the City of Mound Bayou, in 1947, adopted a subdivision plat which contained an erroneous legal description, encompassing Mabel’s east-property line. Because one may not subdivide and convey or dedicate land one does not own, we can confidently say that the City of Mound Bayou acted without legal authority in that instance, at least to the extent its action affected the preexisting rights enjoyed by Mabel and her predecessors-in-title.
 
 See, e.g.,
 
 Eugene McQuillin, 11A The Law of Municipal Corporations § 33.12-70 (3rd ed.).
 

 ¶ 23. As to Delta’s contention that the City of Mound Bayou was a necessary party, we fail to see what interest, actual or mistaken, the City had with this strip of land. When this action began, either Delta or Mabel owned it. Based on our review of the record, the conveyance to Delta involved the unplatted portion of the Rox-C-Sneed subdivision, with no dedication provision for the City contained therein.
 
 See, e.g., Albright v. Baker,
 
 213 Miss. 234, 238, 56 So.2d 703, 704 (1952). We do not find that the City’s absence in this matter prevented the chancery court from granting complete relief between Delta and Mabel.
 
 See
 
 M.R.C.P. 19.
 

 ¶ 24. This issue is without merit.
 

 II. Res Judicata
 

 ¶ 25. Delta avers that pursuant Mississippi Code Annotated section 27-45-23 (Rev.2006), a conveyance to a purchaser at tax sales by the chancery clerk, after the period of redemption under law, vests in the purchaser a perfect title with the immediate right of possession. Thus, the final judgment entered by the chancery court in 1995 vested perfect title in Her
 
 *581
 
 man and in subsequent conveyances. Therefore, Mabel’s action should be barred by res judicata. We disagree.
 

 ¶ 26. First, not only was Mabel not made a party to that action, she clearly did not receive proper notice of it as required by Mississippi Code Annotated section 27-48-3 (Supp.2009).
 
 See, e.g., Curtis v. Carter,
 
 906 So.2d 758, 759 (¶¶ 6-7) (Miss.2005) (affirming chancellor’s decision to set aside tax sale insofar as it pertained to those persons with ownership interest in the property who were without proper notice). Further, section 27-45-23 also states, “[n]o such conveyance shall be invalidated by any court except by proof that the land was not liable to sale for the taxes.... ” Mabel submitted ample evidence that her property has never been the subject of delinquent taxes; accordingly, this strip of land was not liable to sale for non-payment of taxes.
 

 ¶ 27. Mabel was not barred from asserting her ownership rights in this matter. This assignment of error is without merit.
 

 III. Equitable Estoppel and/or Lach-es
 

 ¶ 28. Delta claims that a balancing of the equities in this matter clearly weighs in its favor, and submits that the chancery court erred when it rejected its defenses of laches and/or equitable estop-pel. Delta contends that before Mabel filed her action for injunction in August 1997, she had actual notice of the development project both by virtue of the initial survey that was conducted in April 1994 and via Beamon, who personally met with Mabel in March 1996 and discussed the project with her. Delta further asserts that the property at issue is valued at $800 and that a mandatory injunction requiring the removal of the infrastructure now in place would cost the company approximately $60,000 to carry out. In other words, the issuance of the injunction would cause Delta to suffer loss far greater than the loss Mabel would suffer if the injunction were not issued.
 

 ¶ 29. In
 
 Shattles v. Field, Brackett & Pitts, Inc.,
 
 261 So.2d 795, 797-98 (Miss.1972), the supreme court reiterated the rule regarding property rights and the issuing of injunctions pertaining to such rights:
 

 The general rule is that a landowner is entitled to an injunction directing the removal of a trespassing structure on his land erected thereon by the owner of adjoining land. The facts that the aggrieved owner suffers little or no damage from the trespass, that the wrongdoer acted in good faith and would be put to disproportionate expense by removal of the trespassing structures, and that neighborly conduct as well as business judgment would require acceptance of compensation in money for the land appropriated, are ordinarily [not] reasons for denying an injunction. Rights in real property cannot ordinarily be taken from the owner at a valuation, except under the power of eminent domain. Only when there is some estoppel or laches on the part of the plaintiff, or a refusal on his part to consent to acts necessary to the removal or abatement which he demands, will an injunction ordinarily be refused.
 

 ¶ 30. Laches and equitable es-toppel are similar legal principles. Laches arises from a complaining party’s failure to assert a right or claim “for an unreasonable and unexplained length of time, under circumstances prejudicial to [the] adverse party.”
 
 Cannada v. Marlar,
 
 185 So.2d 649, 651 (Miss.1966) (citation omitted). Equitable estoppel comes into play in situations where a party has changed his or her position in reliance upon the conduct
 
 *582
 
 or representation of another and as a result suffers detriment or prejudice caused by the change of position.
 
 PMZ Oil Co. v. Lucroy,
 
 449 So.2d 201, 206 (Miss.1984) (citation omitted). What constitutes laches or equitable estoppel has been held to depend on the facts and circumstances of each particular case.
 
 See Cannada,
 
 185 So.2d at 651 (discussing laches) and
 
 Bright v. Michel,
 
 242 Miss. 738, 749, 137 So.2d 155, 159 (1962) (same, with respect to equitable estoppel). Therefore, a trial court’s decision to accept or reject either doctrine will not be disturbed on appeal when the decision’s factual findings are supported by substantial evidence.
 
 Cannada,
 
 185 So.2d at 651.
 

 ¶ 31. On the question of whether Mabel should have been barred from her cause of action under the doctrine laches, we note that this particular defense has been viewed by our supreme court with disfavor in similar matters. In
 
 Clanton v. Hathorn,
 
 600 So.2d 963, 966 (Miss.1992), before addressing the appellant’s laches claim on the merits, the court opined as follows:
 

 The problem of laggardly landowners who ignore claims or encroachments over long periods of time has been addressed by the [L]egislature. Miss. Code Ann. § 15-1-13 (1972) is our familiar ten-year adverse possession statute. That act would seem to occupy the field. This would certainly seem the premise of our cases that laches is not a defense to an action if the plaintiff proceeds within the period of the applicable statute of limitations.
 
 Hans v. Hans,
 
 482 So.2d 1117, 1121 (Miss.1986);
 
 Continental Oil Co. v. Walker,
 
 238 Miss. 21, 34, 117 So.2d 333, 337-38 (1960); Griffith, Mississippi Chancery Practice, 344-45 (2d Ed.1950). It is difficult to imagine a case where we would credit a laches defense on an adverse claim to real property on grounds other than those set forth in the statute and cases reading [the] same. Of course, it is not necessary that we address so sweeping a point, it being sufficient that today’s is not such a case.
 

 Cf. Pittman v. Currie,
 
 414 So.2d 423, 428 (Miss.1982) (reiterating that Miss.Code Ann. § 15-1-17, which prescribes a two-year limitation to file suit to cancel tax titles following the period of redemption, does not apply when the tax sale is void and the owner has remained in possession).
 

 ¶ 32. That said, assuming arguendo that Delta’s theory has credence, we find no error with the chancellor’s decision to reject this claim on the merits. After considering the evidence submitted by both sides and hearing their respective arguments, the chancellor found that Mabel did not act with unreasonable delay in bringing her action. According to the chancellor, regardless of which point in time Mabel first learned of the development project, she had no idea at that time that the structures in question would be placed on her property. When Mabel discovered that Delta was claiming ownership to the strip of land she believed rightfully belonged to her, she acted as expeditiously as could be expected of a person in her situation to obtain the information necessary to protect her interests.
 

 ¶ 33. As to the inequitable loss Delta claims it will suffer by the mandatory injunction, such a result is a factor for the chancellor to take into consideration. However, it is not the controlling consideration on the question of laches or equitable estoppel.
 
 Cf. Bright,
 
 242 Miss. at 749, 137 So.2d at 159 (addressing estoppel).
 

 ¶ 34. We note that Delta did not affirmatively raise the defense of equitable es-toppel in its pleadings; however, it was discussed at the hearing. Thus, we find
 
 *583
 
 Rule 15(b) of the Mississippi Rules of Civil Procedure controlling. On this question, we find no merit to Delta’s contention that Mabel should be estopped to complain of the encroachment. Nothing in the record remotely suggests that Delta changed its position in reliance upon Mabel’s conduct. Indeed, before construction began, Mabel told Delta not to interfere with her property. Once it became apparent to Mabel that Delta had plans to place the structures on her property, she expressly warned the company that there would be legal consequences if they proceeded. Delta disregarded her cautionary advice and continued with construction; Mabel followed through on her word, and she had Beamon arrested for trespassing.
 

 ¶ 35. Based on our review of the record, Delta received numerous indicators that should have given the company cause for concern in this matter. Apart from Mabel’s admonitions, Delta was put on notice by others who were familiar with the two properties that it was mistaken as to the true property line. The record even indicates that Hooker informed Delta that there might be a question with the Rox-C-Sneed subdivision plat. Yet, rather than exercise precaution, Delta proceeded forward. This issue is without merit.
 

 ¶ 36. THE JUDGMENT OF THE BOLIVAR COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE, P.J., GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ„ CONCUR. IRVING, J., NOT PARTICIPATING.
 

 [1]
 

 . The appellee’s name is spelled as Mable and Mabel in the record; however, according to the appellee, the correct spelling is Mabel.
 

 [2]
 

 . Mabel later inherited the property from Holt; to avoid any confusion, it will hereinafter be referred to as Mabel’s property.
 

 [3]
 

 . Herman is not related to Mabel.
 

 [4]
 

 . Alfreta and Mabel, also of no relation, grew up together. Alfreta lived in a house located behind Mabel's property. According to Mabel, she and Alfreta walked to school together every day, which required them to walk across Mabel’s property, a portion of which included the disputed area.
 

 [5]
 

 .According to the record, Herman was a board member of Delta at the time; Herman also served as alderman on the Mound Bayou City Council from 1970 to 2000.
 

 [6]
 

 . Both Herman and Alfreta, eventually, were dismissed from the case.
 

 [7]
 

 . Mabel's east-property line runs from the northeast corner of the property directly south to an old "railroad iron” which, according to the Allen & Hoshall survey, marks the southeast corner of her property. The west-boundary line of the Rox-C-Sneed subdivision is described as starting from the northwest corner of the northeast quarter of the southeast quarter of Section-T.-23N.-R.5 West. This corner lies in common with the northeast corner of Mabel’s east-property line. Instead of running due south, the Rox-C-Sneed subdivision's west-boundary line uses a southwest, one-degree, bearing. In his deposition, Evans indicated that drawing from the course run described by the Rox-C-Sneed subdivision plat results in a line ending eighteen feet west of the "railroad iron” found by Allen & Hoshall.
 

 [8]
 

 . The district court found that Mabel's claim of title to the thirty-five-foot strip of land by adverse possession vanished when the land sold for taxes in 1988; thus, the defendants were entitled to judgment as a matter of law. As noted in the district court's memorandum order, the defendants did not dispute that Mabel held record title to the eighteen-foot strip of land and admitted that there was an encroachment thereof.